UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| LORETTA SABRINA MARSHALL, individually and on behalf of all others similarly situated | CASE NO.: 2:21-cv-2733-RMG-JDA |
| Plaintiff, | **COMPLAINT** (JURY TRIAL REQUESTED) |
| vs. | |
| GEORGETOWN MEMORIAL HOSPITAL d/b/a TIDELANDS HEALTH, | |
| Defendant. | |

## NATURE OF THE ACTION

An employer is permitted to give a post-offer of employment medical examination only if the results are used "in accordance with" disability law. If the results are used to screen out individuals with disabilities, the screening standard must be job related and consistent with business necessity.

Defendant gives new hires a medical examination that has no direct relationship to any job function. It uses a "target-strength" that is beyond what is required for the job. It uses the results—not in accordance with disability law, but to screen out new hires who are likely to increase Defendant's worker's comp, health insurance, pharmacy, and disability costs. This is an unlawful use of a medical examination.

The examination also has disparate impact of female new hires, who tend to have less strength than males. By violating disability law, the discharges also violate public policy. And the discharges violate ERISA § 510.

Plaintiff brings this class action lawsuit under the ADA, Title VII of the Civil Rights Act of 1964, and the Rehabilitation Act of 1973, ERISA § 510, and Wrongful Discharge in

Violation of Public Policy to end Defendant's egregious unlawful employment practices and to provide appropriate relief to the Plaintiff and similarly situated individuals who have been harmed by Defendant's unlawful practices.

## JURISDICTION AND PARTIES

1. Georgetown Memorial Health d/b/a Tidelands Health (Tidelands Health) is an integrated health care delivery network with four hospitals and more than 60 outpatient centers.

2. At all relevant times Defendant has continuously been an employer within the meaning of the ADA, Title VII of the Civil Rights Act of 1964, the South Carlina Human Affairs Law, ERISA, and the Rehabilitation Act of 1973.

3. Tidelands Health accepts federal funds through Medicare billing and is subject to the Rehabilitation Act of 1973.

4. The events giving rise to the Plaintiff's individual claim occurred predominantly in Georgetown County, South Carolina.

5. Plaintiff Loretta Sabrina Marshall is a citizen and resident of Georgetown County, South Carolina.

6. The Plaintiff is female and a qualified individual with a disability within the meaning of the ADA, the South Carolina Human Affairs Law, and the Rehabilitation Act of 1973.

7. Jurisdiction is proper under 28 U.S.C. § 1331 because this action involves causes of action that arise under the laws of the United States of America.

8. This Court has supplemental jurisdiction of Plaintiff's state law claims under 28 U.S.C. § 1367.

9.  Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in the District of South Carolina.

## BACKGROUND FACTS

*Defendant's Pattern or Practice of Unlawfully Using the*
*Results of a post-employment offer medical examination.*

10. Since at 2010 and continuing to the present, Defendant has at all of its locations required all new hires (except physicians) to pass an isokinetic strength test prior to employment ("the test").

11. The test is administered after Defendant extends a job offer and the new hire accepts the offer.

12. Defendant only extends the job offer after it has screened the candidate and determined that it is qualified for the position.

13. Therefore, all individuals to whom Defendant extends a job offer are qualified within the meaning of the ADA.

14. The test is administered by a medical health care professional who is an employee of Defendant.

15. The new hire is required to fill out and/or sign three forms.

16. One form is entitled, "New hire Background Information Form."

17. On this form the new hire is required to give their date of birth, age, gender, height and dominant hand and state whether the new hire has a history of "Fractures, Strains or Sprains."

18. The Defendant's purpose of asking if the new hire has a history of Fractures, Strains or Sprains is to determine if they are likely to make a workers' compensation claim.

19. The technician administering the test checks the new hire's weight and writes it on

the form.

20. Under equipment type, the form states "Biodex 4."

21. Biodex 4 refers to a machine that is built and marketed by a company called, "Biodex Medical Systems Inc."

22. The Biodex 4 is machine is a computerized robotic dynamometer.

23. The second form is entitled "Memo of Understanding," which the new hire must sign acknowledging certain representations.

24. The third form tells the new hire to notify the technician of "any prior or current injuries . . . particularly to the shoulder, knee or trunk muscles (Include strains, sprains, breaks, surgery or other related abnormalities."

25. The new hire must also inform the technician if he or she is taking any "prescribed or over-the-counter medication that could affect my ability to perform the evaluation."

26. The new hire must inform the technician if he or she has "diabetes, high blood pressure or other health-related concerns that could affect your ability to perform the evaluation."

27. The form requires the new hire to acknowledge that she "will be asked to give maximum, all-out effort within the limits of my ability, and that I will be performing short periods of strenuous exercise."

28. The test is administered in a medical building in a room that has the appearance of a typical medical examination room. The room had cabinets, a medical scale, a blood pressure cuff and a stethoscope.

29. The test is given in a medical setting.

30. The testing conducted by the Defendant includes blood pressure screening.

31. The technician uses the blood pressure cuff and stethoscope to take the new hires blood pressure.

32. If the blood pressure is at or above 140 systolic / 90 diastolic, the test is not administered.

33. As stated above, the technician also takes the new hire's weight.

34. The machine the Defendant uses to administer the test is a "Biodex Isokinetic Dynamometer – System 4" (the machine).

35. The machine is a medical device, used by medical providers to identify, diagnoses and treat physical impairments that cause functional limitation.

36. Marketing material found on the Biodex's website describes this machine as "a hi-tech device used for muscle testing and rehabilitation by medical and physiotherapy professionals."   https://www.iprsmediquipe.com/products/biodex-isokinetic-system-4/ (last accessed August 16, 2021).

37. Marketing material for the machine found on the Biodex's website states, "This isokinetic dynamometer allows you to evaluate strength, endurance, power and range of motion of all major joints and muscles, and provides highly detailed objective data." *Id.*

38. Marketing material for the machine found on the Biodex's website states, "Sports and orthopaedic medicine, paediatric medicine, neuro-rehabilitation, industrial medicine and researchers all depend on the Biodex System 4 dynamometer for its isokinetic testing to provide consistent, accurate and objective data." *Id.*

39. Marketing material for the machine found on the Biodex's website states, that the machine is used by medical clinics and research facilities around the world. *Id.*

(embedded youtube video).

40. Marketing material for the machine found on the Biodex's website states that it is used for sports and orthopedic medicine, paediatric medicine, neurorehabilitation, older adult medicine, and industrial medicine to provide to objective data to clinicians to support treatment paths. And that it is used to "test and rehabilitate patients. *Id.* (embedded youtube video).

41. Marketing material for the machine found on the Biodex's website states that the machine provides "accurate document assessment of physical impairment." *Id.* (embedded youtube video).

42. Marketing material for the machine found on the Biodex's website state that the machine can create progress reports that track strength, pain, range of motion, and other defined measurements. *Id.* (embedded youtube video).

43. Marketing material for the machine found on the Biodex's website states that the machine is designed to document patient progress to prove the effectiveness of treatment, and to help the clinician provide "fast effective care" and "get patients better, faster." *Id.* (embedded youtube video).

44. Marketing material for the machine found on the Biodex's website states that the machine is "the fastest way to identify, document, and treat physical impairments that cause functional limitation." *Id.* (embedded youtube video).

45. Marketing material on Biodex's website states that "poor muscular strength constitutes a risk factor for on-the-job injuries, and can predict susceptibility to many diseases."

46. Marketing material on Biodex's website states that its conducting pre-employment

testing with its product, "enables companies to assess whether job applicants will become true assets to their workforce – or present risks of injuries, absenteeism and susceptibility to disease."

47. The primary function marketed by Biodex for the machine is its ability to "Identify, treat and document the physical impairments that cause functional limitations."

48. The machine measures range of motion, muscle strength, and motor function.

49. The machine does not test the new hire's ability to perform actual or simulated job tasks.

50. The machine does not measure the new hire's ability to stand, sit, walk, run, lift, bend or squat.

51. At no point during the examination is the new hire asked engage in a task that simulates the performance of any particular job duty.

52. In Defendant's isokinetic strength testing, the new hire is first strapped into a computer driven device. The new hire then goes through a series of movements with the left and the right knee as well as the left and right shoulder against resistance



created by the machine.

53. The resistance created by the machine varies for each new hire based on that individual's height, weight, gender, and age.

54. The test purports to measure the foot/pound force an individual can exert through their shoulders and knees.

55. The information from the test is sent to a third-party vendor called Industrial Physical Capability Services (IPSC) to be interpreted.

56. IPSC uses "expert staff" to analyze the results of the test and make a recommendation to the Defendant.

57. The test is pass/fail.

58. Each job has a target strength ranging from Light, to Light-Medium, to Medium, to Medium Heavy.

59. Defendant offers new hires who fail an opportunity to participate in a 90-day strength training program.

60. At the end of the strength training program, the new hire may re-test.

61. Defendant gives the new hire 90 days to successfully complete the re-test.

62. Defendant revokes the job offer of any new hire who is unable to pass the isometric strength test at the level set for the position in question within 90 days.

63. Defendant does not do an individualized assessment of the new hires ability to safely perform the essential functions of the job.

64. Defendant does not allow any reasonable accommodation in the administration of the test for new hires who have a disability that impairs their ability to perform the test.

65. The Defendant hired a company called Mavspar to assess the physical demands of each job that Defendant hires for.

66. The Defendant took the results of Mavspar's work to IPSC, which created the isokinetic strength test, which Defendant now utilizes.

67. The Defendant claims that the results can somehow be used to determine whether the new hire has sufficient strength, flexion, and extension to perform the essential functions of any given job.

68. The same isokinetic machine, which solely tests movement of the knees and shoulders in an obscure concentric range of motion, can somehow assess every position in Defendant's workforce.

*Unlawful use of a post-employment offer medical examination*

69. Marketing on IPSC's website claims that its isokinetic testing can reduce an employer's medical costs, injury costs, pharmacy costs, and help build a "stronger, healthier, more productive workforce!"

70. Marketing on IPSC's website also claims that its isokinetic testing can "decrease-lost time."

71.  Marketing on IPSC's website says its product "allows for placement of a healthier worker into physically demanding jobs – impacting your bottom line."

72. The website says that after implementing its evaluations, "over a five-year period your average ROI could be as much as $17 for every dollar spent per year!"

73. Marketing on IPSC's website says that use of isokinetic testing will screen out new hires with obesity—which plays a "critical role in rising healthcare costs in industry today."

74. Marketing material on IPSC's website says that by screening out obese workers, its isokinetic testing will reduce absenteeism and presenteeism.

75. Reducing "absenteeism" if code for reducing the employer's obligation to give leave to employee's with a disability as an ADA reasonable accommodation.

76. IPSC's marketing uses code to tell employer's that using it isokinetic testing will reduce the numbers of employee with ADA disabilities, and therefore reduce the cost and burden of ADA reasonable accommodation.

77. Obesity is correlated with certain ADA disabilities.

78. Some of the cost saving that IPSC's isokinetic testing helps an employer realize, are ADA reasonable accommodation costs, such as medical leave for a disability, or higher insurance costs because of medical treatment individuals with may require.

79. Some of the cost saving that IPSC's isokinetic testing helps an employer realize are simply the costs of employing employees with certain disabilities, like medical costs, injury costs, and pharmacy costs.

80. The plain message of ICPS's marketing is that its isokinetic testing can help an employer screen out individuals with certain disabilities, in order to realize the employer large cost savings.

81. Defendant relied on ICPS's marketing in decided to utilize its isokinetic strength test program.

82. At all relevant times, Defendant has been aware that one of the core purposes of the ADA is to ensure employment opportunities for individuals with disabilities by eliminate exclusionary qualification standards.

83. Defendant at all relevant times has been aware that it is unlawful to utilize a pre-

employment medical examination when the exclusionary criteria is not job related or consistent with business necessity.

84. At all relevant times, the Defendant has been aware that it is unlawful to utilize a pre-employment medical examination or physical examination for the purpose of screening out employees with certain disabilities in order to reduce costs.

85. At all relevant times, the Defendant has been aware that the ADA only permits post-employment offer physical examination when it is examination is job-related and consistent with business necessity.

86. At all relevant times, Defendant has been aware that it would be unlawful to use a permits post-employment offer physical examination for the purpose of building a stronger healthier workforce, reducing its medical and injury costs.

87. Yet for more than a decade, Defendant has utilized ICPS's isokinetic test, which is marketed based on its ability to exclude individuals with certain disabilities.

88. Defendant has realized savings in its health insurance, pharmacy, disability and Workers' Compensation claims as a result of its use of ICPS's isokinetic test.

89. Defendant has also reduced "absenteeism" as a result of its unlawful employment practices.

90. The Defendant does not perform an individualized assessment of whether the new hire present ability to safely perform the essential functions of the job.

91. If a new hire is unable to pass the test, Defendant withdraws the offer of employment.

92. Defendant does not give the new hire the opportunity to consider another position with a lower strength target.

93. In such a case, the Defendant does not make any effort to analyze whether there is

a reasonable accommodation that will allow the new hire to perform the essential functions of the job or otherwise engage in the interactive process.

94. The Defendant does not allow new hires any alternative to the test or accommodation in taking the test.

95. When new hires disclose disabilities while the test is being administered, Defendant's pattern or practice is to not inquire further about the disability.

96. The Defendant has a pattern or practice of not using the test results in accordance with 42 U.S.C. § 12112.

97. The Defendant has a pattern or practice of not engaging in disability accommodation or the ADA good faith interactive process with new hires who fail the test.

98. The manner in which the Defendant uses the results of the test is not in accordance with 42 U.S.C. § 12112 and is therefore unlawful.

99. Because Defendant does not use the test results in accordance with 42 U.S.C. § 12112, Defendant's use of the test results to withdraw job offers is unlawful in every instance.

100. Defendant's use of the test results screens out or tends to screen individuals with disabilities and classes of individuals with certain disabilities.

101. The Defendant's unlawful employment practice has a disparate impact on new hires who are female.

102. The Defendant's unlawful employment practice has a disparate impact on hew hires who are qualified individuals with a disability within the meaning of the ADA.

103. Defendant's unlawful employment practice has a disparate impact on new hires who are older.

104. Defendant's unlawful employment practices alleged herein are systematic and constitute a pattern or practice of discrimination.

105. The target strength set by Defendant for each job constitutes a "Qualification" within the meaning of 42 U.S.C. § 12112.

106. The target strength Qualifications set by the Defendant for the job in its workforce screen out or tend to screen out individuals with disabilities but are not job-related for the position in question or consistent with business necessity.

107. When a new hire fails the test, Defendant does not determine whether there is a reasonable accommodation that would allow the new hire to fulfill the essential functions of the job.

108. Defendant's unlawful employment practice alleged herein, was conducted at each location where the Defendant does business, and with every new hire during the statutory period, except for physicians.

109. As a result of Defendant's unlawful practices, numerous new hires who were able to perform the essential functions of the job with or without accommodation, had their job offer withdrawn, and as a direct and proximate result suffered damages.


**PLAINTIFF MARSHALL**

*Defendant withdraws job offer due to results of unlawful medical examination*

110. Plaintiff Marshall is a highly qualified Registered Nurse (RN).

111. Ms. Marshall has been licensed RN in the state of South Carolina since 2007.

112. Ms. Marshall worked for the Defendant as an RN from 2008 to 2011.

113. At the time, the Defendant did not require isokinetic testing for new hires.

114. Ms. Marshall had a satisfactory performance and disciplinary record with Defendant and left on good terms in March of 2011 for another job.

115. In September of 2011, Ms. Marshall wanted to return to employment with the Defendant.

116. She applied for an RN position with Defendant.

117. At that point, Defendant had implemented isokinetic testing for new hires.

118. Defendant offered her the position, but Ms. Marshall could not pass the isokinetic testing.

119. Ms. Marshall participated in a strengthening program offered by Defendant and attempt the test again. She lost weight in the program, but her score was worse than her first attempt. Defendant withdrew the offer of employment.

120. In 2011 when Ms. Marshall failed to pass the isokinetic test twice, she just resigned a position working successfully as a Nurse Manager for Prince George Healthcare— a nursing home. Her duties in that included performing RN duties. She resigned that position because Defendant had made her a job offer.

121. After Defendant revoked the job offer, the Plaintiff was hired by Williamsburg Regional Hospital for an RN position, with comparable work and environment and job duties to Plaintiff's 2011 position with Defendant.

122. Ms. Marshall had quit her job with her previous employer after Tidelands Health offered her the position. Fortunately, her former employer hired her back after Tidelands Health withdrew the position.

123. Ms. Marshall applied for an RN position with Defendant in 2015 or 2016. Defendant offered her an RN position, but withdrew the offer when she could not pass the

isokinetic test.

124. At the time, Ms. Marshall was working as clinical nursing instructor, which required her to perform RN duties at various hospital and lab settings.

125. In 2020 Ms. Marshall applied for an RN position once more.

126. This time she for a "PRN" position with Defendant as a RN.

127. PRN means "pro re nata" or "as needed."

128. Ms. Marshall applied for a PRN position instead of a full-time position only so she could keep her current job until she found out if she passed the isokinetic test.

129. She intended to become full time with Defendant if she passed the isokinetic test.

130. Ms. Marshall had a reasonable expectation that if she passed the isokinetic test, she would become full time with the Defendant and have ERISA benefits including health insurance, short term disability coverage, an ERISA 401k retirement plan, and other benefits.

131. Defendant received Ms. Marshall's application and resume and interviewed her for the position.

132. On July 13, 2020, Tidelands Health Recruitment Coordinator Julie Hills emailed Ms. Marshall an "offer" of employment.

133. The terms of the offer were that the position was PRN with no benefits, and the pay rate was $33.32 per hour plus "applicable differentials."

134. The email gave her instructions on how to accept the offer, which should she could do via email or telephone.

135. It further said that more details would be provided if she wanted to "move forward and accept the offer."

136. Ms. Marshall accepted the offer by telephone.

137. On July 14, 2020, Tidelands Health Recruitment Coordinator Julie Hills emailed Ms. Marshall back confirming Ms. Marshall's acceptance of the offer.

138. The subject line of the email was "Welcome to Tidelands Health – Next Steps"

139. The email stated, "We are excited that you have accepted employment with TIdelands Health . . . ."

140. Upon Ms. Marshall's acceptance of the "offer," an at-will employer-employee contract and relationship was formed between Plaintiff and Defendant.

141. The email explained that Ms. Marshall needed to schedule the isokinetic examination.

142. After the isokinetic testing, she would need to schedule Employee Health processing, which included drug screening, a health history review, and verification of all titers, immunizations, "health requirement for your particular position" and her vaccination records.

143. Ms. Marshall emailed the Defendant if there was an alternative to the isokinetic testing. The email asked: "Are there any other alternatives to this system used? Such as a more observational assessment that do not require age weight and height as a determining factor with calculations/results."

144. Tidelands Health Talen Acquisition Specialist Karly Davis replied, "Unfortunately, there are no alternatives to the test. The test is a strength to weight ratio. The sex, age, and height are not used in determining the score."

145. On July 15, 2020, Ms. Marshall appeared for the test.

146. The location of the test was Waccamaw Medical Park South, located on the

campus of Tidelands Waccamaw Community Hospital.

147. The test was given in a room with the appearance of a typical medical examination room. The room had cabinets, a medical scale, a blood pressure cuff and a stethoscope.

148. The test was administered by Tidelands Health employee Anna Spears.

149. Ms. Spears is a licensed physical therapist with a doctorate in physical therapy.

150. Ms. Spears gave Ms. Marshall paperwork to fill out.

151. The reason for test listed by Defendant in two places in the paperwork was: "New Hire."

152. Ms. Marshall disclosed her height, age and gender and that she was right hand dominant.

153. Ms. Spears took Ms. Marshall's weight and noted it in the paperwork.

154. The paperwork asked Ms. Marshall to disclose if she had "diabetes, high blood pressure or other health related concerns."

155. Ms. Marshall disclosed that she had recently given birth and had a cesarean section surgery, which included tubal ligation and hernia repair.

156. Ms. Marshall further disclosed to Ms. Speers that she had postpartum hypertension.

157. The paperwork asked her if she has a history of "fractures, sprains, or strains." Ms. Marshall answered "No."

158. Ms. Spears checked Ms. Marshall's blood pressure.

159. The first reading exceeded the limits.

160. She took another reading.

161. The second reading was within limits.

162. Ms. Marshall said Ms. Spears, "I don't think this is a fair test. Is there another test you can give me that does not measure my height and weight?"

163. Ms. Spears said, "No. We have done this for years. It is proven to lower our Workers' Compensation claims and disability costs."

164. Ms. Spears administered the test.

165. The next day Defendant emailed her and told her she had not passed the test.

166. Defendant offered to allow her to participate in a strength training program, but never responded to Plaintiff's telephone calls to make those arrangements.

167. On September 8, 2020, the Ms. Marshall attempted the isokinetic test again.

168. On September 9, 2020, Tidelands emailed Ms. Marshall and informed her that she had not passed the test.

169. Defendant withdrew its offer of employment to Plaintiff.

170. At the time Ms. Marshall failed the test in 2020, she was working successfully as an RN at McLeod Regional Medical Center and Williamsburg Regional Medical Center. Both employers are hospitals with comparable work duties and work environment to the position with Defendant.

171. Defendant did not engage in the ADA interactive process with the Plaintiff.

172. Despite learning of her disabilities, Defendant did not ask the Plaintiff about the specific limitations caused by her disabilities.

173. Defendant did not consider or discuss with Plaintiff whether there was a reasonable accommodation that would allow her to perform the essential functions of the job.

174. The Defendant did not use the results of the test in accordance with Title I of the Americans with Disabilities Act or the South Carolina Human Affairs law.

175. Defendant used the results of the test to save money on health insurance, pharmacy costs, disability claims, and worker's compensation claims.

176. The Defendant used the test to screen out individuals with certain disabilities, not because they were unable to perform the essential functions of the job, but rather in order to save Defendant money.

*The Plaintiff is a Qualified individual with a Disability*

177. Ms. Marshall has a condition known as hypothyroidism.

178. Ms. Marshall's hypothyroidism, when it is flared up, it causes sluggishness, lethargy, fatigue, weight gain, difficulty with concentration and focus, and depression.

179. Ms. Marshall is obese.

180. Ms. Marshall's hypothyroidism is a contributing factor to her obesity.

181. Ms. Marshall has postpartum hypertension (high blood pressure).

182. When Ms. Marshall's postpartum hypertension is elevated, it causes headache, chest discomfort, and palpitations.

183. Defendant was aware of her postpartum hypertension because she disclosed it to Tidelands employee Anna Spears in part of Tidelands effort to collect medical information about the Plaintiff.

184. Defendant was also aware of her postpartum hypertension because Defendant employee took her blood pressure and found it was above 140/90.

185. Despite her disabilities, Ms. Marshall was able to fulfill the essential functions of

the job, with or without accommodation.

186. This is proven by the fact that Ms. Marshall has worked successfully as a RN continuously since 2007 to the present without any accommodation.

187. Her work history includes three years of serves as an RN for the Defendant doing the same duties as the position that Defendant withdrew when she failed the test.

188. In fact, she was working successfully as an RN for another employer with comparable work conditions and comparable duties when Defendant allegedly determined that she could not fulfill the duties of the RN position she was hired for.

*Inability to pass the Isokinetic has no relationship to whether*
*an individual can perform the essential functions of any particular position.*

189. The Defendant claims that inability to pass the isokinetic test at the level determined for a particular position means that the individual cannot perform the essential functions of the job.

190. This is wrong for several reasons:

191. Ms. Marshall's long and successful work history as an RN, including working as an RN for the Defendant, demonstrates she is able to fulfill the essential functions of the job.

192. Defendant also gives the test to its incumbent employees. If the employee fails the test, they remain employed in the same position, but pay a higher rate for health insurance. This proves that an employee is able to fulfil the essential functions of the job although they cannot pass the test.

193. The novel concentric shoulder and knee ranges of motion measured by the test bear no relationship to the performance of any job duty in Defendant's work force.

194. The job duties in a given position do not vary based on an employee's height,

weight, gender or age. There is no explanation for why the administration of the test should vary according to the individual's height, weight, age or gender, if the test purports to measure the ability to perform the essential functions of the job.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

195. On February 10, 2021, the Plaintiff's filed a charge of discrimination directed to the EEOC and the South Carolina Human Affairs Commission.

196. Her charge was filed within 300 days of the when the Defendant withdrew its employment offer.

197. Her charged alleged disability discrimination, sex discrimination and that Defendant's discriminatory practices applied to every job applicant.

198. On May 26, 2021, the EEOC issued a Notice of Right to Sue letter on her charge.

199. The Plaintiff has exhausted administrative remedies, as required, and filed this action within the applicable statute of limitations.

## CLASS ACTION ALLEGATIONS

200. Plaintiff Marshall brings ADA, Title VII of the Civil Rights Act of 1964, and the Rehabilitation Act of 1973, the ADEA, ERISA 510, and Wrongful Discharge in Violation of Public Policy pursuant to Rule 23 in order to end Defendant's unlawful employment practices and to all available monetary and equitable relief to the Plaintiff and similarly situated individuals who have been harmed by Defendant's unlawful practices.

201. The Plaintiff anticipates the following classes:

    a.  New hires who are Qualified Individuals with a Disability; who were offered a position by Defendant; and Defendant withdrew the job offer based on

the results of an isokinetic strength test; during appropriate statutory period for each respective law. A Qualified Individual with a Disability is an individual with a physical impairment or a record of a physical impairment which substantially impairs on or more activity of daily living and who were able to perform the essential functions of the job with or without accommodation. The impairment does not have to be severe, significant, or permanent or even active.  (ADA, Rehabilitation Act of 1973, South Carolina Human Affairs Law) ["Disability Class"]

b.  New hires who had a job offer withdrawn during the appropriate statutory period based on the results of isokinetic testing that was administered by Defendant in a manner that determines whether the new hire has a physical impairment that causes functional limitations; ["Regarded as class"]

c.  All new hires who do not have disabilities, who were offered a position by Defendant, and Defendant withdrew the job offer based on using the results of isokinetic testing in a manner that is not in accord with disability law, during the applicable statutory period (Wrongful Discharge in Violation of Public Policy) ["Violation of Public Policy Class"]

d.  Female new hires who were offered a position by Defendant, and Defendant withdrew the job offer based on the results of isokinetic testing during the applicable statutory period. (Title VII of the Civil Rights Act) ["Sex Discrimination class"]

e.  All new hires, who were offered a position by Defendant, and Defendant

withdrew the job offer based on the results of isokinetic testing with the intent of preventing the new hire from obtaining an ERISA benefit. (ERISA 510.) ["ERISA class"]

202. Class treatment for each class is appropriate because the classes are so numerous that joinder of all members is impractical. The number of class members in each class will be determined in discovery.

203. Class treatment for each class is appropriate because there are questions of law or fact common to the class, including but not limited to:

    a. Whether the practices of the Defendant complained of herein are unlawful practices under state and or federal law;

    b. Whether the unlawful employment practice complained of herein was a companywide pattern or practice of the Defendant;

    c. Whether the Defendant's use of the results of the test screened out or tended to screen out individuals with disabilities or certain classes of individuals with disabilities (ADA, Rehabilitation Act of 1973, South Carolina Human Affairs Law);

    d. Whether the Defendant's use of the results of the test was job related to each position in question and consistent with business necessity (ADA, Rehabilitation Act of 1973, South Carolina Human Affairs Law);

    e. Whether the Defendant discriminated against certain class members on the basis of disability (ADA, Rehabilitation Act of 1973, South Carolina Human Affairs Law);

    f. Whether the Defendant has used Qualification standards that screen out or

tend to screen out individuals with disabilities and certain classes of individuals with disabilities. ADA, Rehabilitation Act of 1973, South Carolina Human Affairs Law);

g. Whether Defendant used the isokinetic test and strength standard to determine if new hires had a physical impairment that caused functional limitations, and therefore "regarded" all new hires who failed the test as having an ADA disability;

h. Whether Plaintiff and putative class members were "employees" of Defendant within the meaning of ERISA. (ERISA 510)

i. Whether Plaintiff and putative class Defendant were "participants" within the meaning of ERISA. (ERISA 510)

j. Whether Defendant had the specific intent to preemptively interfere with the attainment of rights under ERISA by the Plaintiff's and putative class members. (ERISA 510)

k. Whether the Defendant's use of the results of the test had a disparate impact of female new hires.

l. Whether Defendant's use of the results of the test violates public policy as set forth in S.C. Code § 1-13-85 and 42 U.S.C. § 12112.

m. Whether Defendant's termination of certain class members based on using the results of the test in a manner that violates South Carolina and federal law states a claim for Wrongful Discharge in Violation of Public Policy.

n. Whether monetary and equitable relief requested herein is warranted.

o. Whether punitive damages are warranted.

204. Defendant is expected to raise certain common defenses to the Class Claims.

205. Class treatment for each class is appropriate because Plaintiff's claims are typical of the claims of the class, and the named plaintiff will fairly and adequately represent the interests of the class.

206. Class treatment for each class is appropriate because Plaintiff has retained competent counsel who are experienced in class action litigation and will effectively represent the interests of the class.

207. Class treatment for each class is appropriate under Rule 23(b)(1) because prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant, and/or would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or  would substantially impair or impede their ability to protect their interests.

208. Class treatment for each class is also appropriate under Rule 23(b)(2) because Defendant has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

209. Class treatment for each class is appropriate under Rule 23(b)(3) because common questions of law and fact, including those listed above, predominate over any questions affecting only individual members, and because a class action is superior to other available methods for the fair and efficient adjudication of this

controversy.

210.    Finally, Class treatment for each class is appropriate under Rule Civil

Procedure 23(c)(4) because this is a case in which class adjudication of

particular issues would serve the interests of the parties and the Court.

**FOR A FIRST CAUSE OF ACTION**
**DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA, THE**
**REHABILIATION ACT OF 1973, AND THE SOUTH CAROLINA HUMAN**
**AFFAIRS LAW**

211. The Plaintiff re-alleges all foregoing paragraphs as if restated herein verbatim.

212. Defendant is an employer subject to the obligations and prohibitions set forth in

the Americans with Disabilities Act and the ADA Amendments Act of 2008, 42

U.S.C. §§ 12101 et seq (ADA); the Rehabilitation Act of 1973, as amended, 29

U.S.C. § 701 et seq. (Rehabilitation Act of 1973); and the South Carolina Human

Affairs Law, as amended, S.C. Code § 1-13-10 et Seq. (Human Affairs Law).

["Disability Discrimination Laws"].

213. At all times relevant, the Plaintiff and the Disability Class employees of the

Defendant and Qualified Induvial with a Disability within the meaning of Disability

Discrimination Laws.

214. Defendant made a job offer to Plaintiff and Disability Class.

215. Plaintiff and Disability Class accepted Defendant's job offer.

216. Under 42 U.S.C. § 12112(d)(3)(C) and S.C. Code § 1-13-85(C)(3), Defendant is

only permitted to conduct an employee entrance examination if the results of the

examination are only used in accordance with the provisions found in 42 U.S.C. §

12112. And S.C. Code § 1-13-85.

217. The Defendant gave Plaintiff and every Disability Class member post-offer of employment medical examination.

218. Defendant did not use the results of the Plaintiff's or Disabilities Class's test in accordance with in 42 U.S.C. § 12112 or S.C. Code § 1-13-85.

219. Defendant used the results of Plaintiff's and Disabilities Class's test in a way that screens out or tends to screen out individuals with disabilities or classes of individuals with disabilities.

220. Defendant's use of the test results was not job-related for the position in question or consistent with business necessity.

221. Defendant used a Qualification standard in the hiring of Plaintiff and Disability class members that screens out or tends to screen out individuals with disabilities or classes of individuals with disabilities.

222. The Qualifications standards used by Defendant are not job-related for the position in question or consistent with business necessity.

223. Defendant failed to make an individualized determination as to whether Plaintiff or Disability Class were able to perform the essential functions of the position with or without reasonable accommodation.

224. Defendant failed to engage in the ADA good faith interactive process with Plaintiff or Disability Class.

225. Defendant knew or should have known that its actions violated disability law, but intentionally continued its discriminatory practices despite this knowledge with reckless disregard for the rights of Plaintiff and the Disability Class.

226. Plaintiff and Disability Class have suffered economic and noneconomic damages

as a direct and proximate result of Defendant's unlawful conduct.

227. The Plaintiff and Disability Class seek back wages, front wages, compensation, compensatory damages, equitable relief, punitive damages, costs and attorney's fees in such amounts as are just and proper as well as other relief available by statute or common law or within the authority of this Court.

## FOR A SECOND CAUSE OF ACTION
## DISABILITY DISCRIMINATION UNDER THE "REGARDED AS" PRONG:

228. The Plaintiff re-alleges all foregoing paragraphs as if restated herein verbatim.

229. Defendant used medical device to perform an employee entrance examination on Plaintiff and Regarded As class in a manner that of identified whether the Plaintiff or Regarded As class had a physical impairment that cause functional limitations.

230. Defendant regarded each new hire that failed the test, including Plaintiff and Regarded As class, as having an ADA disability.

231. Defendant's use of the results of the entrance medical exam to engage in disability discrimination against Plaintiff and Regarded As class in violation of 42 U.S.C. § 12112(d)(3)(C) and S.C. Code § 1-13-85(C)(3).

232. Defendant knew or should have known that its actions violated disability law, but intentionally continued its discriminatory practices despite this knowledge with reckless disregard for the rights of Plaintiff and the Disability Class.

233. Plaintiff and Disability Class have suffered economic and noneconomic damages as a direct and proximate result of Defendant's unlawful conduct.

234. The Plaintiff and Disability Class seek back wages, front wages, compensation, compensatory damages, equitable relief, punitive damages, costs and attorney's

fees in such amounts as are just and proper as well as other relief available by statute or common law or within the authority of this Court.

## FOR A THIRD CAUSE OF ACTION
## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

235. The Plaintiff re-alleges all foregoing paragraphs as if restated herein verbatim.

236. It is the public policy of the state of South Carolina and the Unites States that an employer may only give a post-job offer medical examination if the results are used only in accordance with the South Carolina Human Affairs Law and the ADA.

237. The Defendant used the results of a post-job offer medical examination of the Plaintiff and the Violation of Public Policy class, in a manner that was not in accordance with the South Carolina Human Affairs law and the ADA.

238. The Defendant's termination of the Plaintiff and the Violation of Public Policy class violated the law and therefore public policy.

239. Defendant knew or should have known that its actions violated disability law, but intentionally continued its discriminatory practices despite this knowledge with reckless disregard for the rights of Plaintiff and the Violation of Public Policy class.

240. Plaintiff and Violation of Public Policy class have suffered economic and noneconomic damages as a direct and proximate result of Defendant's unlawful conduct.

241. The Plaintiff and Violation of Public Policy class seek back wages, front wages, compensation, compensatory damages, equitable relief, punitive damages, costs and attorney's fees in such amounts as are just and proper as well as other relief available by statute or common law or within the authority of this Court.

## FOR A FOURTH CAUSE OF ACTION

## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

242. The Plaintiff re-alleges all foregoing paragraphs as if restated herein verbatim.

243. Defendant is an employer subject to the obligations and prohibitions set forth in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

244. Defendant at all times relevant has maintained particular employment practice which is neutral on its face, but has a significant and substantial disparate impact on new hires who are female.

245. That employment practice is Defendant's practice of giving new hires a post-job offer medical examination, and withdrawing job offers from those who do not reach a target strength for the position.

246. Defendant's sets the target strength at level that is higher than is necessary to for the new hire to perform the job duties.

247. Defendant's employment practice has a significant substantial disparate impact on female new hires.

248. Plaintiff and Sex Discrimination Class are members of a protected class: they are women.

249. Plaintiff and Sex Discrimination class were harmed by Defendant's employment practice in that they had their job offer from Defendant withdrawn as a direct and proximate result of Defendant's employment practice.

250. Defendant knew or should have known that its use of the IPSC strength test had a disparate impact on female new hires, because the EEOC has sued in 2017 to stop CSX Transportation, Inc. from using that same test on its employees because of the statistically demonstrated disparate impact on female employees.

251. Despite this knowledge, Defendant has continued to use the test, in knowing, willing, intentional disregard of the rights of Plaintiff and Sex Discrimination class.

252. Defendant refused to implement an effective alternative practice of selection device that would have a lesser disparate impact.

253. Defendant strength testing is not job related for the position in question or consistent with business necessity.

254. Plaintiff and Sex Discrimination class have suffered economic and noneconomic damages as a direct and proximate result of Defendant's unlawful conduct.

255. The Plaintiff and Sex Discrimination class seek back wages, front wages, compensation, compensatory damages, equitable relief, punitive damages, costs and attorney's fees in such amounts as are just and proper as well as other relief available by statute or common law or within the authority of this Court.


## FOR A FIFTH CAUSE OF ACTION
## VIOLATION OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974

256. The Plaintiff re-alleges all foregoing paragraphs as if restated herein verbatim.

257. Defendant is an employer subject to the obligations and prohibitions set forth in the Employee Retirement Income Security Act of 197a, as amended, 29 U.S.C. § 1001 et Seq., specifically, Section 510, 29 U.S.C. § 1140.

258. Under ERISA § 510, Defendant is prohibited from discharging expelling, or discriminating against an employee for the purpose of interfering with the employee's exercise or attainment of rights under an ERISA-governed plan.

259. Defendant made job offers to Plaintiff and ERISA 510 class, which Plaintiff and

ERISA 510 class accepted.

260. Plaintiff and ERISA 510 class formed an employee-employer relationship with Defendant.

261. Plaintiff and ERISA class at all relevant times were participants within the meaning of ERISA.

262. Plaintiff and ERISA 510 class had a reasonable expectation of obtaining ERISA benefits from Defendant.

263. Defendant gave Plaintiff and ERISA 510 class a post-job offer medical examination for the purpose of determining whether Plaintiff and ERISA 510 class were likely to increase Defendant's costs with regard to the ERISA-governed plans it offers its employees.

264. Defendant determined based on the result of the post-job offer medical examination that employing Plaintiff and ERISA 510 class would increase Defendant's costs with regard to the ERISA-governed plans it offers its employees.

265. In order to avoid higher costs with regard to the ERISA-governed plans and it offers its employees and to stop them from obtaining benefits, Defendant withdrew its job offer to Plaintiff and ERISA 510 class to stop them from obtaining future benefits.

266. Defendant did in fact realize substantial savings through its unlawful employment practice.

267. Defendant knew that it violated ERISA to withdraw a job offer in order to interfere with an employee's attainment of present or future ERISA benefits, but it intentionally and willfully proceeded with its unlawful employment practice in

disregard of Plaintiff and ERISA class's rights.

268. Plaintiff and ERISA 510 class have suffered economic and noneconomic damages as a direct and proximate result of Defendant's unlawful conduct.

269. The Plaintiff and ERISA 510 class seek all damages available under 29 U.S.C. § 1132 including but not limited to front pay, back pay, lost past and future benefits, other money damages, equitable relief, costs and attorney's fees in such amounts as are just and proper as well as other relief available by statute or common law or within the authority of this Court.

## EQUITABLE RELIEF

270. The Plaintiff seeks an order from the Court:

    a. Requiring Defendant to immediately end its use of the results of a physical or medical examination to withdrawal a job offer or otherwise terminate the employment of an any employee, unless the Defendant has engaged in an individualized good faith interactive process with the individual and determined that there is no disability accommodation available that is not an undue hardship on the operation of Defendant's business;

    b. Requiring Defendant for the next five years to conduct 2 hours of training on a yearly basis for its supervisors and officers on ADA disability accommodation and the good faith ADA interactive process;

    c. Requiring Defendant for the next five years to conduct 2 hours of training on a yearly basis for its supervisors, officers, and Human Resource personnel on employee rights under Title VII of the Civil Rights Act of 1964 to include the concept of disparate impact;

d.  Requiring Defendant on a yearly basis to report on the manner of compliance with the terms of any final order for non-monetary equitable relief issued by this Court — to include the names and positions of training attendees, the hours of training conducted, the subject matter of each training, the location of each training, date of each training, the agenda of each training, and the names and qualifications of each person conducting said training;

e.  Requiring Defendant to electronically deliver a copy of jury verdict and trial court judgment to each supervisor and officer and HR employee of Defendant;

f.  Requiring Defendant to reinstate Plaintiff to her and all Class members to employment with Defendant in the position previously offered; and,

g.  Requiring Defendant to place a copy of the jury verdict and trial court judgment in Plaintiff's personnel file and the personnel file of each Class member.

**WHEREFORE**, the Plaintiff prays for judgment against the Defendant for all injuries and damages, interest, liquidated damages, fees and costs and equitable remedies set forth in this complaint and/or allowed, provided for or permitted by the common law or statutory law in such an amount as shall be determined by the finder of fact under the evidence presented at trial, and for further relief as the Court may deem just and proper.

Respectfully submitted,

s/David A. Nauheim

David A. Nauheim
SC Bar Number 102083
*david@nauheimlaw.com*
NAUHEIM LAW OFFICE, LLC
P.O. Box 31458
Charleston, SC 29417
Tel: 843 534-5084
Fax: 843 350-3572

ATTORNEY FOR THE PLAINTIFF

August 24, 2021