IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| LORETTA SABRINA MARSHALL, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br>   v.<br><br>GEORGETOWN MEMORIAL HOSPITAL D/B/A TIDELANDS HEALTH,<br>          Defendant. | Case No. 2:21-cv-2733-RMG<br><br>**ORDER AND OPINION** |

    Before the Court is nonparty IPCS Holdings, LLC d/b/a DataFit's ("Datafit") motion to quash and modify a subpoena served by Plaintiff. (Dkt. No. 72). Plaintiff responded in opposition (Dkt. No. 73), Datafit replied (Dkt. No. 74) and Plaintiff filed a sur reply (Dkt. No. 75). Defendant Georgetown Memorial Hospital d/b/a Tidelands Health ("Tidelands") filed a response in support of Datafit's motion to quash (Dkt. No. 76). For the reasons below, the Court denies Datafit's motion to quash.

**I.   Background**

    This suit arises from a hiring dispute involving a physical agility test ("PAT program"), which Defendant administers to individuals it has determined are qualified for the relevant position. (Dkt. No. 1 at ¶¶ 11-12). The technician administering the test checks the potential employee's age, gender, height, dominant hand, weight, and any prior injuries or other health-related concerns. (Dkt. No. 1 at ¶¶ 17, 19, 24, 26). The machine that Defendant uses to administer the test is a "hi-tech device used for muscle testing and rehabilitation by medical and physiotherapy professionals." (Dkt. No. 1 at ¶ 36). The machine measures range of motion, muscle strength, and motor function, but does not test the individual's ability to engage in a task

1

that simulates performance of a particular job duty. (Dkt. No. 1 at ¶¶ 48, 49). The information from the test is sent to a third-party vendor called Datafit to be interpreted. (Dkt. No. 1 at ¶ 55). Each job has a target strength level required, and Datafit analyzes the data from the PAT program to determine if an individual has reached that threshold. (Dkt. No. 1 at ¶ 56, 58). Based on this, Datafit makes a recommendation to Defendant whether to hire the individual. (Dkt. No. 1 at ¶ 56). These individuals are given the opportunity to retake the test after 90 days. (Dkt. No. 1 at ¶ 61). Plaintiff alleges that this process disproportionately harms women, older individuals, and people with certain disabilities. (Dkt. No. 1 at ¶¶ 101-103). Plaintiff alleges that Defendant deliberately employs the PAT Program to reduce the costs associated with hiring people with disabilities. (Dkt. No. 1 at ¶¶ 84-87).

  Plaintiff alleges that she was a victim of discrimination when she was denied a job offer after going through the PAT program, despite her qualifications. (Dkt. No. 1 at ¶¶ 169, 225). Plaintiff worked for Defendant as a registered nurse ("RN") from 2008 to 2011, before the PAT program was being used for new hires. (Dkt. No. 1 at ¶¶ 112, 113). Plaintiff had a satisfactory performance and disciplinary record and left on good terms in March 2011 for a new job. (Dkt. No. 1 at ¶ 114). In September of 2011, Plaintiff wanted to return so she applied for a RN position with Defendant. (Dkt. No. 1 at ¶¶ 115, 116). Plaintiff alleges that she was offered the position, but that she had to pass the PAT program to keep the offer. (Dkt. No. 1 at ¶ 118). She failed the first test, and after failing the second, Defendant allegedly withdrew the offer of employment. (Dkt. No. 1 at ¶ 119). In 2015 or 2016, Plaintiff allegedly applied for another RN position with Defendant, was offered a position, but Defendant withdrew the offer when she failed the PAT Program. (Dkt. No. 1 at ¶ 123). In 2020, Plaintiff applied for a part time RN position. (Dkt. No. 1 at ¶¶ 125-128). Plaintiff alleges that on July 13, 2020, Defendant emailed her an offer of

employment, with instructions on how to accept the offer. (Dkt. No. 1 at ¶¶ 132-135). Plaintiff alleges that she accepted the position by telephone and on July 14, 2020, Defendant emailed Plaintiff confirming her acceptance of the offer, stating "We are excited that you have accepted employment with Tidelands Health . . . ." (Dkt. No. 1 at ¶¶ 136-140). The next day, Plaintiff appeared for the PAT program, and Defendant collected data including her weight, height, age, gender, and other health related concerns. (Dkt. No. 1 at ¶¶ 147-155). Datafit determined that she did not reach the target strength level required for the part time RN position, so Plaintiff failed the test, and after 90 days, failed it again. (Dkt. No. 1 at ¶¶ 167-168). Defendant allegedly then withdrew its offer of employment. (Dkt. No. 1 at ¶ 169). Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") on February 10, 2021.

When she failed the test, Plaintiff alleges she was working as an RN at McLeod Regional Medical Center and Williamsburg Regional Medical Center, jobs with comparable work duties to the RN position with Defendant. (Dkt. No. 1 at ¶ 170). Plaintiff notes that she has hypothyroidism, which contributes to her obesity, and postpartum hyper tension, which contributes to high blood pressure, headaches, chest discomfort, and palpitations. (Dkt. No. 1 at ¶¶177-182). Plaintiff alleges that Defendant knew about her disabilities and knew that she could perform the job successfully, as she did from 2008-2011. (Dkt. No. 1 at ¶¶183-188). Plaintiff alleges that "Tideland's PAT program has a disparate impact on female new-hires and new-hires with ADA disabilities," and that Defendant used the test to screen out individuals with certain disabilities to save money. (Dkt. Nos. 1 at ¶¶ 174-176; 73 at 1).

Specifically, Plaintiff's causes of action include disability discrimination in violation of the ADA, the Rehabilitation Act of 1973, and the South Carolina Human Affairs Law, wrongful discharge in violation of public policy, violation of Title VII of the Civil Rights Act of 1964,

3

violation of the Employee Retirement Income Security Act of 1974. (Dkt. No. 1). Plaintiff seeks equitable relief and plans to pursue this case as a class action.

On November 15, 2024, Plaintiff sent Datafit a subpoena for documents and electronically stored information. (Dkt. No. 72-1 at 3). On November 21, 2024, Plaintiff sent Datafit a subpoena with the same exact requests plus an additional one. (Dkt. No. 72-1 at 5). Datafit now objects to the subpoena, seeking to modify and limit Request Nos. 1 and 4-8 and quash Request No. 12. (Dkt. No. 72-1). The relevant subpoena excerpts are below.

> Please produce complete copies of all records and files related to DataFit's work and relationship with Georgetown Memorial, including but not limited to:
> [Request No. 1:] all correspondence (including letters, emails, and text message by employees, directors and agents of DataFit with or concerning Georgetown Memorial . . .
> [Request No. 4:] The raw data from DataFit's comprehensive database of 600,000+ assessments related to its PCA Program
> [Request No. 5:] The key to DataFit's comprehensive database of 600,000+ assessments related to its PCA Program
> [Request No. 6:] The Column and Row headings for DataFit's comprehensive database of 600,000+ assessments related to its PCA Program
> [Request No. 7:] All analysis and/or descriptive anaylsis performed on the data in DataFit's comprehensive database of 600,000+ assessments related to its PCA Program, whether by DataFit or another party.
> [Request No. 8:] All documents related to DataFit's validity testing or analysis of the PCA program, i.e. the relationship between the passing or failing the test and the ability to perform job tasks. . .
> [Request No. 12:] A copy of each algorithm or formula used in DataFit's PCA program

(Dkt. No. 72-3). Datafit requests this Court to modify and limit Request No. 1 because it is overly broad and burdensome. Datafit also requests this Court to modify Request Nos. 4-8 to protect its proprietary trade secrets and confidential information. Lastly, Datafit requests this Court to quash Request No. 12 to protect Datafit's trade secret and the basis of its entire business. Plaintiff responded in opposition (Dkt. No. 73), Datafit replied (Dkt. No. 74) and

4

Plaintiff filed a sur reply (Dkt. No. 75). Defendant Tidelands filed a response in support of Datafit's motion to quash (Dkt. No. 76).

## II. Legal Standard

Rule 45 of the Federal Rules of Civil Procedure "expressly permits a party to issue discovery subpoenas to a nonparty for documents and things in the nonparty's possession, custody, or control." *In re Rule 45 Subpoena Issued to Robert K. Kochan*, No. 5:07-MC-44-BR, 2007 WL 4208555, at *4 (E.D.N.C. Nov. 26, 2007) (citing Fed. R. Civ. P. 45(a)(1)(C)). "The scope of discovery for a nonparty litigant under a subpoena duces tecum issued pursuant to Rule 45 is the same as the scope of a discovery request made upon a party to the action under Rule 26." *Alston v. DIRECTV, Inc.*, No. 3:14-cv-04093-JMC, 2017 WL 1665418, at *2 (D.S.C. May 3, 2017); *see also HDSherer LLC v. Nat'l Molecular Testing Corp.*, 292 F.R.D. 305, 308 (D.S.C. 2013) (explaining the scope of discovery allowed under a Rule 45 subpoena is equivalent to the scope of discovery allowed under Rule 26). "Thus, regardless of whether the Court considers [Defendant]'s Motion under Rule 45 or Rule 26, the Court must review [Plaintiff]'s subpoena[ ] under the relevancy standards set forth in Rule 26(b)." *Singletary v. Sterling Transport Co.*, Inc., 289 F.R.D. 237, 240-41 (E.D. Va. 2012) (citations omitted) (citing *Cook v. Howard*, 484 Fed.Appx. 805, 812 (4th Cir. 2012) (per curiam)). Pursuant to Fed. R. Civ. P. 26(b)(1):

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

5

Rule 45 requires the court to quash or modify a subpoena that "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). "A subpoena that seeks information irrelevant to the case is a per se undue burden," and "[a] subpoena that would require a non-party to incur excessive expenditure of time or money is unduly burdensome." *Livingston Jr.*, 2020 WL 8167497, at *4. "The burden of proving that a subpoena is oppressive is on the party moving to quash." *Fleet Bus. Credit, LLC v. Solarcom, LLC*, No. Civ. AMD 05-901, 2005 WL 1025799, at *1 (D. Md. May 2, 2005) (internal quotation marks omitted). Determining whether a subpoena is unduly burdensome is within the discretion of the district court. *Bland v. Fairfax Cty.*, 275 F.R.D. 466, 468 (E.D. Va. 2011).

**III. Discussion**

1. Request No. 1

Datafit argues that Request No. 1 imposes an undue burden on Datafit by lacking a timeframe and particularity regarding the requested correspondence. (Dkt. No. 72-1 at 7-8). Datafit notes that this request does not limit production to correspondence that relates to this action, and there is no timeframe. (Dkt. No. 72-1 at 7). Datafit alleges that Defendant Tidelands has been a client since 2009, and searching through all that correspondence would impose a great burden to Datafit. (*Id.*). Datafit alleges that its employees would have to "open each individual electronic document to determine whether that correspondence is with or concerns Defendant" and that "a significant number of DataFit's client records from the earlier years are stored in hard copy with Iron Mountain, under the Lake Erie salt flats." (Dkt. No. 72-1 at 7). Datafit claims that scanning and reviewing years of physical documents stores with Iron Mountain and searching for correspondence incur major time and cost expenses. (Dkt. No. 74 at 3). Further, Datafit argues

that Plaintiff has not demonstrated that this correspondence cannot be obtained from Defendant. (Dkt. No. 74 at 1).

Plaintiff argues that Datafit has not established that this request would be unduly burdensome. (Dkt. No. 73 at 7). Plaintiff contends that searching email correspondence does not entail an undue burden, and that Iron Mountain advertises that documents stored in its underground facility, all have "Rapid Accessibility" and can be "shipped immediately upon request" or "imaged for instant access." (Dkt. No. 73 at 8). Dr. Gilliam, the founder of Datafit and developer of the PAT Program, testified that he had personally communicated with Defendant Tidelands since 2008. (Dkt. Nos. 75 at 2; 75-1 at 4). Dr. Gilliam testified that he uses Outlook for his email and is able to use its search function to search for emails with certain recipients. (Dkt. No. 75 at 2). Currently, Datafit has not produced a single email from Dr. Gilliam. (Dkt. No. 75 at 2). Plaintiff has also established that it cannot obtain this correspondence from Defendant Tidelands. Tideland's VP of Human Resources testified that in 2023, Tidelands implemented a Document Retention Policy which requires the destruction of all documents and emails after 12 months. (Dkt. No. 75 at 3).

The Court agrees with Plaintiff. Datafit has failed to establish that Request No. 1 is unduly burdensome. Datafit can access its correspondence with Tidelands with relative ease via Outlook or Iron Mountain services. The correspondence is also relevant; Dr. Gilliam designed the PAT Program for Tidelands in 2008, and Dr. Gilliam has personally communicated with Defendant ever since. Because the efficacy of the PAT program is itself a defense against Plaintiff's disparate impact claims, it is important for Plaintiff to have access to any correspondence that could reveal discriminatory motives in designing the test. Further, the Court

finds that Plaintiff has sufficiency demonstrated that she cannot access these messages through Defendant Tidelands. Therefore, the Court denies Datafit's motion to quash as to Request No. 1.

2. <u>Request Nos. 4-8, & 12</u>

Datafit alleges that Request Nos. 4-8 and 12 request Datafit's trade secret as well as confidential research, development, and commercial information. Datafit alleges that its "entire business has been built on its proprietary mathematical model and algorithm developed by its prior owner and retired CEO Dr. Gilliam" and that "DataFit has become an industry leader by protecting the secrecy of this model and algorithm." (Dkt. No. 72-1 at 8). Further, Datafit argues that it must keep its proprietary algorithm secret or else "Plaintiff will inevitably expose [it] in public filings to DataFit's competitors." (Dkt. No. 72-1 at 9). Datafit argues that an agreed confidentiality order would not protect Datafit and its business because "Plaintiff seeks to undermine the validity of the model and algorithm, which adversely affects DataFit's business relationships with all its customers." (Dkt. No. 72-1 at 9). Datafit alleges that Plaintiff would have access to all of Datafit's customer's data, Datafit does not own the data, Plaintiff is requesting trade secrets, and Plaintiff already had the opportunity to question Dr. Gilliam about the data. (Dkt. Nos. 72-1 at 4; 74 at 7). Therefore, Datafit moves for Request Nos. 4-8 to be modified to preclude the production of Datafit's trade secret and confidential information, and for Request No. 12 to be quashed because it expressly asks for Datafit's trade secrets.

Plaintiff argues that the data is relevant and Datafit has no basis to withhold it. (Dkt. No. 73 at 8). Datafit claims that the "validity of the PAT program is supported by statistical analysis of the data in its comprehensive database of over 600,000 PAT assessments." (Dkt. No. 73 at 8). Tidelands' lawyers concluded that the PAT Program was legal based on their review of the process, case studies and data provided by Datafit. (Dkt. No. 73-6 at 4). Defendant Tidelands

also claimed that the "PAT Program can determine if an applicant can perform the essential functions of the job." (Dkt. No. 75 at 7). Plaintiff alleges that Defendant's defense in this case "hinges on the theory that the PAT program is justified by legitimate, non-discriminatory, and non-pretextual business reasons unrelated to disability or gender." (Dkt. No. 73 at 1). Defendant Tidelands also contends that the test is a "professional developed ability test and, thus, cannot be used as the basis for an unlawful discrimination finding." (Dkt. No. 59 at 11). Plaintiff argues that this data is necessary to rebut Defendant Tideland's defense regarding the efficacy of the PAT program. For example, Plaintiff alleges that the PAT program has not been assessed for false positives, so Plaintiff must examine candidates who failed the PAT program, but were, in fact, able to perform the essential job functions of the position. (Dkt. No. 75 at 7).

Regarding the ownership concerns over the data, Defendant has no contract with Tidelands governing the ownership of its data, nor has it produced any NDA's that would prevent it from producing the data. (Dkt. No. 73 at 9; Dkt. No. 75 at 11). Plaintiff stipulates that only the data concerning Tidelands' applicants is relevant to damages but claims that the entirety of the data is necessary to establish liability. (Dkt. No. 73 at 10). Further, Plaintiff's statistical expert states that he needs the entirety of the data to analyze the validity of the PAT Program and Datafit's claims. (Dkt. No. 73 at 10). Lastly, Plaintiff argues that the Court's confidentiality order (Dkt. No. 70) and protective order (Dkt. No. 71) are sufficient to protect the business interests of Datafit.

The Court agrees and finds that Plaintiff has established relevance and a substantial need for this data. Neither party appears to dispute that the data sought by these requests is a trade secret or that its disclosure could harm Datafit's business. Datafit's primary argument is that production of the algorithm will harm its business, but Datafit has failed to demonstrate that the

9

algorithm or associated data would be produced for the public. The Court granted a confidentiality order (Dkt. No. 70) signed by Plaintiff's expert witness, and a protective order (Dkt. No. 71), shielding any information from public disclosure. Therefore, the Court denies Datafit's motion to quash as to Request Nos. 4-8, and 12.

      Defendant Tidelands' Motion in Support

Defendant Tidelands argues that the subpoena should be limited to the 300 Day-Period prior to the filing of Plaintiff's EEOC charge. (Dkt. No. 76 at 3). Defendant invokes *Jenkins v. Blue Cross Blue Shield of South Carolina*, for the contention that in "South Carolina, the charge must be filed within 300 days after an 'alleged unlawful employment practice' occurred." 2022 WL 20054299 at *2 (D.S.C. Aug. 17, 2022). In employment discrimination cases, Plaintiffs must exhaust administrative remedies before bringing suit. *Id*. Defendant claims that "each discrete discriminatory act starts a new clock for filing charges alleging that act" and that a refusal to hire is a discrete act. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 (2002). Further, the Supreme Court noted that every "use" of an employment practice that causes a disparate impact is a separate actionable violation of Title VII with its own 180-or 300-day statute of limitations clock. *Lewis v. City of Chicago*, 560 U.S. 205 (2010). Defendant argues that the furthest back Plaintiff can claim a discriminatory practice occurred is April 16, 2020, 300 days before she filed her EEOC charge. (Dkt. No. 76 at 6). Therefore, Defendant argues, Plaintiff cannot subpoena any data or information before that date.

The Court disagrees. Plaintiff's discovery related to damages may be limited by potential statute of limitations restrictions, but Plaintiff seeks to establish Defendant's liability first. Therefore, Plaintiff must be allowed to determine if the PAT Program was designed to be discriminatory, displayed a pattern of discriminatory determinations, or any other information

that may lead to the liability associated with discriminatory behavior. Plaintiff is entitled to subpoena Datafit for data and correspondence relating to Tidelands as far back as 2008, when their relationship and the PAT Program began.

## IV. Conclusion

For the reasons stated above, the Court **DENIES** Datafit's motion to quash (Dkt. No. 72). To the extent the agreements exist, Datafit has until February 19, 2025, to apprise each of its clients of this order so that they may review their confidentiality and nondisclosure provisions governing their data and respond accordingly.

**AND IT IS SO ORDERED.**

s/Richard M. Gergel<br>
Richard Mark Gergel<br>
United States District Judge

February 6, 2025
Charleston, South Carolina